UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.  2:23-cv-214 |
| ) | |
| ENERGY TRANSFER (R&M), LLC; ) | |
| EL PASO, LLC; and THE GOODYEAR ) | |
| TIRE & RUBBER COMPANY ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT

The United States of America (the "United States"), by the authority of the Attorney

General of the United States, acting on behalf of the United States Environmental Protection

Agency ("EPA"), through the undersigned attorney, files this Complaint and alleges as follows:

## NATURE OF THE ACTION

1.     This is a civil action brought by the United States against the Defendants pursuant to

Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act

of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9607(a). The United States seeks to recover

unreimbursed costs incurred for actions undertaken in response to the release or threatened

release of hazardous substances into the environment at or from the Brine Service Company

Superfund Site in Corpus Christi, Nueces County, Texas (the "Site").  The United States also

seeks a declaratory judgment, pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2),

declaring that Defendants are liable for any further costs that the United States may incur in connection with response actions that may be performed at the Site not otherwise reimbursed.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action and over the Defendants under 28 U.S.C. §§ 1331 and 1345, and under CERCLA Section 113(b), 42 U.S.C. § 9613(b).

3.      Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and CERCLA Section 113(b), 42 U.S.C. § 9613(b), because the claim arose, and the release or threatened release of hazardous substances occurred, within this District.

## THE DEFENDANTS

4.      Defendant Energy Transfer (R&M), LLC ("Energy Transfer") is a Pennsylvania limited liability company. Subject to a reasonable opportunity for investigation and discovery, Energy Transfer is the corporate successor to Suntide Refining Company and was previously registered to do business in Texas. Subject to a reasonable opportunity for investigation and discovery, Suntide Refining Company arranged for the transport and disposal of oil field and/or refinery wastes containing hazardous substances at the Site. In 1975, Suntide Refining Company merged with and into Sun Oil Company of Pennsylvania.  In 1981, Sun Oil Company of Pennsylvania changed its name to Sun Refining and Marketing Company. Sun Refining and Marketing Company became Sun Company, Inc. (R&M) in 1991 and later changed its name to Sunoco, Inc. (R&M) in 1998.  In more recent years, Sunoco, Inc. (R&M) became Energy Transfer (R&M), LLC. "Energy Transfer" is used herein to refer to Energy Transfer (R&M), LLC and all corporate predecessors listed above.

2

5.      Defendant El Paso, LLC ("El Paso") is a Delaware limited liability company registered to do business in Texas. Subject to a reasonable opportunity for investigation and discovery, El Paso is the corporate successor to Coastal States Gas Producing Company. Subject to a reasonable opportunity for investigation and discovery, Coastal States Gas Producing Company arranged for the transport and disposal of oil field and/or refinery wastes containing hazardous substances at the Site. In 1979, Coastal States Gas Producing Company changed its name to Valero Energy Company, and later became PG&E Gas Transmission, Texas Corporation in 1997. PG&E Gas Transmission, Texas Corporation changed its name to El Paso Gas Transmission Company in 2000, and in 2002, the company merged with and into El Paso Corporation.  In 2012, El Paso Corporation changed its name to El Paso Interim Corporation. The same year, El Paso Interim Corporation converted to a limited liability company under the name El Paso, LLC. "El Paso" is used herein to refer to El Paso, LLC and all corporate predecessors listed above.

6.      Defendant The Goodyear Tire & Rubber Company ("Goodyear") is an Ohio corporation with its principal place of business at 200 Innovation Way, Akron, Ohio 44316. Goodyear is the corporate successor to Wingfoot Commercial Tire Systems, LLC ("Wingfoot"). Wingfoot was a joint venture formed in 2000 between Goodyear and Treadco, Inc. (now known as Arkansas Best Corporation). In 2003, Treadco, Inc. sold its membership interest in Wingfoot to Goodyear; thereby, making Wingfoot a wholly owned subsidiary of Goodyear. In 2017, Wingfoot merged into Goodyear and ceased existence as a separate legal entity. Subject to a reasonable opportunity for investigation and discovery, Wingfoot disposed of hazardous substances at the Site during its operations. "Goodyear" is used herein to refer to The Goodyear Tire & Rubber Company and Wingfoot Commercial Tire Systems, LLC.

3

7.     Defendants Energy Transfer, El Paso, and Goodyear are each a "person" within the meaning of CERCLA Section 101(21), 42 U.S.C. § 9601(21).

## GENERAL ALLEGATIONS

**The Site**

8.     The Site encompasses approximately 16 acres in a predominantly industrial and petrochemical refining area about six miles west of downtown Corpus Christi, Texas.  Two former waste disposal pit areas – the North Pit and the South Pit – are located at the Site.

9.     The Site comprises Lots 2 through 8 of Block 1, Goldston Addition, as well as a Texas Department of Transportation-owned drainage ditch (the "East Ditch"), and a portion of the Buckeye Texas Processing LLC ("Buckeye") property. Surface water from the East Ditch empties into a northwest trending ditch north of Up River Road, which extends to Tule Lake. Multiple underground pipelines transporting a variety of products transect the Site in various directions. The Site is bounded on the west by Goldston Road, on the east by the Buckeye property, on the south by the frontage road to IH-37, and on the north by Up River Road.

10.     The area of the South Pit occupies Lots 5-7, and a portion of Lot 8B. The North Pit occupies portions of Lots 2-4, and a portion of Lot 8B.

11.     During approximately the 1950s through the1960s, the Brine Service Company, Inc. ("Brine Company") – a former owner and operator of the Site – used the Site as a disposal facility for oil field and refinery wastes, including, but not limited to, tank bottoms and American Petroleum Institute ("API") separator sludge. Brine Company used vacuum trucks to pick up and haul such wastes to the Site, where it disposed of the wastes into the South Pit. The two pits were intermittently connected, and the North Pit received overflow from the South Pit.

4

12.     Subject to a reasonable opportunity for investigation and discovery, Energy Transfer and El Paso generated oil field and/or refinery wastes and arranged with Brine Company for the transport and disposal of such wastes at the Site. Subject to a reasonable opportunity for investigation and discovery, these wastes included, but are not limited to, tank bottoms and/or API separator sludge, which are listed hazardous substances under 40 C.F.R. § 302.4, and which generally contain "hazardous substances" or classes of compounds that include "hazardous substances," within the meaning of CERCLA Sections 101(14) and 107(a), 42 U.S.C. §§ 9601(14) and 9607(a), including benzene, toluene, ethylbenzene, xylene(s), chromium, lead, and other compounds.

13.     By approximately 1973, the North Pit and South Pit were completely backfilled, and no surficial features associated with the pits currently exist. Since about the 1970s, the Site has been used for other industrial commercial and industrial purposes.

14.     From about 2000 to 2014, Goodyear operated a tire shop on a portion of the North Pit area (Lot 3). Subject to a reasonable opportunity for investigation and discovery, Goodyear used lead wheel weights – which are small (roughly 1-inch) lead-containing weights that are attached to wheel rims to balance vehicle tires – at its tire shop. Subject to a reasonable opportunity for investigation and discovery, Goodyear disposed of lead wheel weights into the environment during its operations at the Site.

15.     Site operations resulted in the contamination of Site soil and groundwater. Specifically, hazardous substances that were released at the Site include, but are not limited to, metals, such as lead, chromium, arsenic, and mercury, as well as volatile organic compounds ("VOCs") and semi-volatile organic compounds ("SVOCs"), including benzene, toluene, xylene(s), and ethylbenzene, among other hazardous substances.

16.     As a result of the releases and threatened releases of hazardous substances into soil and groundwater at the Site, EPA has taken various response actions in accordance with CERCLA. Those actions include, but are not limited to, the response actions described below.

**Response Actions at the Site**

17.     Contamination at the Site was first discovered in 1997 when Koch Pipeline Company ("Koch") was excavating a portion of the Site to install interconnecting pipelines. Koch notified the Texas Natural Resource Conservation Commission ("TNRCC") (now the Texas Commission on Environmental Quality ("TCEQ")) of the contamination.  TNRCC inspected the Site and observed visible hydrocarbon staining of the soil, and hydrocarbons were also evident in groundwater seepage in the excavation area. In 2000, TRNCC, in cooperation with EPA, conducted sampling activities at limited areas the Site. This sampling revealed the presence of polycyclic aromatic hydrocarbons (PAHs), benzene, and metals, among other hazardous substances.

18.     Various Phase I and II environmental assessments have also been performed at the Site. These assessments identified the presence of hazardous substances, including metals, such as lead, mercury, and chromium, as well as SVOCs and VOCs, such as benzene, toluene, ethylbenzene, xylene(s), among other substances.

19.     EPA proposed the Site to the National Priorities List on September 13, 2001 (66 FR 47612) and finalized the listing on September 5, 2002 (67 FR 56757).

20.     In October 2009, EPA and a group of potentially responsible parties ("PRPs") executed an Administrative Order on Consent ("AOC") to perform a Remedial Investigation Feasibility Study ("RI/FS") for the Site. EPA oversaw the PRP group's performance of the

RI/FS. Under the AOC's terms, the PRP group agreed to reimburse EPA for its oversight costs of the work required by the AOC, including the RI/FS.

21.     In December 2017, in response to observed light non-aqueous phase liquid ("LNAPL") on the surface water in the East Ditch, the PRP group performing the RI/FS installed a sediment cap in a limited portion of the East Ditch to prevent LNAPL (and associated chemicals of concern) from intruding into the ditch. The sediment cap was extended in February 2020 to further control contamination in the soil and surface water of the East Ditch. The PRP group performed the response action in the East Ditch under the AOC. EPA oversaw the installation of the cap and continues to oversee its maintenance, which is performed by the PRP group.

22.     In 2018, the PRP group performing the RI/FS submitted the final RI for the Site. The RI concluded that soils and groundwater contaminated with hazardous substances posed threats to human health and the environment. In particular, the RI identified LNAPL present in groundwater and residual waste material in the South Pit as needing remediation. It also found hazardous substances, including benzene and arsenic, present in the South Pit area at concentrations that pose a risk to human health.  In the North Pit area adjacent to the East Ditch, metals, including lead, mercury, selenium, and zinc, were present in the soil.

23.     On August 31, 2020, following a public comment period, EPA issued a Record of Decision ("ROD") that selected a remedial action to be carried out at the Site.

## FEDERAL LAW GOVERNING CLAIMS FOR RELIEF

24.     Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1), authorizes EPA to remove or arrange for removal of, and provide remedial action relating to, any release or

threatened release of any hazardous substance, or to take any other response measure that EPA deems necessary to protect the public health or welfare or the environment.

25. Section 104(b)(1) of CERCLA, 42 U.S.C. § 9604(b)(1), authorizes EPA to gather information it deems necessary or appropriate to identify the existence and extent of the release or threatened release of any hazardous substance, and the extent of danger to the public health or welfare or to the environment. In addition, EPA may undertake actions it deems necessary or appropriate to plan and direct response actions, to recover response costs, and to enforce CERCLA actions.

26. Under Executive Order 12,580, *Superfund Implementation*, issued on January 23, 1987, and as authorized by Section 115 of CERCLA, 42 U.S.C. § 9615, the President has delegated his authority under Sections 104(a) and (b) of CERCLA, 42 U.S.C. § 9604(a) and (b), to the Administrator of EPA to arrange for the cleanup of hazardous waste or to conduct investigations and studies as necessary to determine the need for, and extent of, such a cleanup.

27. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section [i.e., 42 U.S.C. § 9607(b)] –
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, [and]
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances,

(4) . . . from which there is a release, or a threatened release, which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

    (A) all costs of removal or remedial action incurred by the United States Government or a State … not inconsistent with the national contingency plan[.]

28.    The national contingency plan ("NCP") provides the "procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants." 42 U.S.C. § 9605(a). The NCP is codified at 40 C.F.R. Part 300.

29.    Section 107(a) of CERCLA, 42 U.S.C. § 9607, also provides that "[t]he amounts recoverable in an action under this Section shall include interest on the amounts recoverable under" subparagraph (A).

30.    Liability under Section 107(a) of CERCLA, 42 U.S.C. § 9607, is strict and joint and several.

31.    Section 113(g)(2)(B) of CERCLA, 42 U.S.C. § 9613(g)(2), provides that, in any action for recovery of costs under Section 107 of CERCLA, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

## FIRST CLAIM FOR RELIEF

### (United States' Claim For Response Costs)

32.    Paragraphs 1-31 are re-alleged and incorporated herein by reference.

33.    The Site is a "facility" within the meaning of Sections 101(9) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(9) and 9607(a), because it is a "site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located[.]" The tire shop, and areas adjacent to the shop, operated by Goodyear also constitute a "facility"

9

within the meaning of Sections 101(9) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(9) and 9607(a), because it is a "building, structure . . . site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located[.]"

34.    There have been "releases" or "threatened releases" of "hazardous substances" at and from these "facilities."

35.    Numerous contaminants have been detected at the Site, including, but not limited to, lead, arsenic, chromium, mercury, benzene, toluene, xylene(s), and ethylbenzene. These substances are "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and the regulations referenced therein, 40 C.F.R. § 302.4.

36.    Lead, arsenic, chromium, mercury, benzene, toluene, xylene, and ethylbenzene, as well as other materials containing "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and the regulations referenced therein, 40 C.F.R. § 302.4, were "released" into the environment at the Site within the meaning of Sections 101(22) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(22) and 9607(a).

37.    From approximately 2000 to 2014, Goodyear "owned or operated" a facility within the meaning of Sections 101(20) and 107(a)(2) of CERCLA, 42 U.S.C. §§ 9601(20) and 9607(a)(2), at the time of "disposal" of a hazardous substance within the meaning of Sections 101(29) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(29) and 9607(a), and Section 1004(3) of the Solid Waste Disposal Act, 42 U.S.C. § 6903(3).

38.    During a period of time in approximately the 1950s and/or the1960s, Energy Transfer and El Paso, by contract, agreement, or otherwise, arranged with Brine Company for the transport and disposal of hazardous substances at the Site within the meaning of Sections

101(29) and 107(a)(3) of CERCLA, 42 U.S.C. §§ 9601(29) and 9607(a)(3), and Section 1004(3) of the Solid Waste Disposal Act, 42 U.S.C. § 6903(3).

39.     As a result of the release or threatened release of hazardous substances at the Site, the United States has undertaken "response actions" within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), to protect the public health, welfare, or the environment within the meaning of Sections 104 and 107 of CERCLA, 42 U.S.C. §§ 9604, 9607, including enforcement-related activities, and may undertake response actions in the future.

40.     The response actions taken by the United States in connection with the Site are not inconsistent with the NCP.

41.     As a result of responding to the releases or threatened releases of hazardous substances at or from the Site, the United States, through July 20, 2023, has incurred approximately $568,694 in costs that remain unreimbursed.

42.     Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Defendants are jointly and severally liable to the United States for all unreimbursed response costs incurred by the United States in connection with its response actions at the Site, including enforcement costs and interest on all such costs.

## SECOND CLAIM FOR RELIEF

### (Declaratory judgment for the United States)

43.     Paragraphs 1–42 are re-alleged and incorporated herein by reference.

44.     The United States will continue to incur response costs associated with the contamination at the Site, including enforcement costs that are recoverable under CERCLA.  Pursuant to Subsection 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), the United States is entitled to entry of a declaratory judgment that each of the Defendants is jointly and

11

severally liable to the United States for future response costs incurred in connection with the Site.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the United States prays that this Court:

1.  Enter judgment in favor of the United States and against Defendants, jointly and severally, for all costs, including prejudgment interest, incurred by the United States for response actions in connection with the Site and not otherwise reimbursed;

2.  Enter a declaratory judgment that Defendants are liable, jointly and severally, for all future response costs incurred by the United States in connection with the Site;

3.  Award the United States its costs in this action; and

4.  Grant such other relief as the Court deems just and proper.

Respectfully Submitted,

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section

Attorney In Charge:  _/s/ Hannah L. Frazier_
HANNAH L. FRAZIER
Oregon Bar No. 215453
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, DC  20044-7611
Telephone: (202) 532-5548
Email:  hannah.frazier@usdoj.gov

ALAMDAR HAMDANI
United States Attorney
Southern District of Texas

JIMMY A. RODRIGUEZ
Deputy Chief, Civil Division
United States Attorney's Office
Southern District of Texas

Local Co-Counsel:     */s/ Lisa Luz Parker*
LISA LUZ PARKER
Assistant United States Attorney
Southern District of Texas
Texas Bar No. 24099248
S.D. Bar No. 3495931
1000 Louisiana, Suite 2300
Houston, Texas 77002
Tel: (713) 567-9489
Fax: (713) 718-3303
E-mail: lisa.luz.parker@usdoj.gov

OF COUNSEL:

AMBER GREMILLION LITCHFIEL
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500
Dallas, Texas 75270